## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

| | | |
|---|---|---|
| ELIZABETH J. PALMER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:14-07317 |
| | ) | |
| CAROLYN. W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Standing Order entered February 26, 2014 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings (Document Nos. 11 and 14.) and Plaintiff's Reply. (Document No. 15.)

The Plaintiff, Elizabeth J. Palmer (hereinafter referred to as "Claimant"), filed an application for DIB on August 17, 2010 (protective filing date), alleging disability as of May 1, 2010, due to "chronic fatigue syndrome, fibromyalgia, depression, severe pain, and arthritis in right knee." (Tr. at 55, 189-97, 207, 211.) The claim was denied initially and upon reconsideration. (Tr. at 118-20, 124-30.) On March 18, 2011, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 131-33.) A hearing was held on June 20, 2012, before the Honorable Geraldine H. Page. (Tr. at 70-98.)  By decision dated July 27, 2012, ALJ Geraldine H. Page determined that Claimant was not entitled to benefits. (Tr. at 55-64.) The ALJ's decision became the final decision

of the Commissioner on December 12, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on February 4, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the

claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(C) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two,

three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, May 1, 2010. (Tr. at 57, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "obesity, chronic fatigue syndrome; fibromyalgia; tendonitis of left shoulder; cervical and lumbar protrusion and bulging, and arthritis of the right knee," which were severe impairments. (Tr. at 57, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 57, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity for light work, as follows:

> [T]he [C]laimant can lift and carry 20 pounds occasionally and 10 pounds frequently, can stand and/or walk no more than 6 hours out of an 8-hour workday, and sit for no more than 6 hours in an 8-hour workday. The [C]laimant can occasionally climb ramps and stairs, balance, kneel, crawl, stoop, crouch, and occasionally reach overhead in work that allows her to avoid extreme temperature, excessive humidity, pollutants, and irritants. The [C]laimant should avoid working around hazardous machinery, unprotected heights, climbing of ladders, ropes, or scaffolds, and working on vibrating surfaces.

(Tr. at 58, Finding No. 5.) At step four, the ALJ found that Claimant was able to return to her past relevant work as a daycare worker, administrative clerk, coin machine collector, and hospital admitting clerk. (Tr. at 61-62, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ also concluded that Claimant could perform jobs such as an office helper and a non-postal mail clerk sorter, at the unskilled, light level of exertion.

(Tr. at 62-63.) On these bases, benefits were denied. (Tr. at 63, Finding No. 7.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on March 6, 1963, and was 49 years old at the time of the administrative hearing on June 20, 2012. (Tr. at 62, 74, 189.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Tr. at 62, 210, 212.) In the past, she worked as a daycare worker, an administrative clerk, a coin machine collector, and a hospital admitting clerk. (Tr. at 62-63, 75-77, 90-91.)

The Medical Record

The Court has considered all evidence of record, including the medical evidence and will

6

summarize it and discuss it below in relation to Claimant's arguments.

Philip J. Branson, M.D. - Orthopaedic Center of the Virginias:

Claimant was referred to Dr. Branson on December 19, 2005, by Dr. Faulkner for complaints of bilateral knee pain, right shoulder pain, and right hip pain. (Tr. at 419-21.) On physical exam, Dr. Branson noted that there was evidence of patellofemoral crepitation, her knees had normal tracking, no effusion, no tenderness in the medial and lateral joints, and her ligament and hip examinations were normal. (Tr. at 420.) Claimant had full range of right shoulder motion, rotator cuff strength was satisfactory, she had minor restriction of the medial rotation, and had some tenderness over the AC joint. (Id.) There was no evidence of active synovitis in the knees or shoulders and neurologic examination was normal. (Id.) The x-rays of Claimant's knees were normal and of her shoulder revealed minor condensation of bone beneath the greater tuberosity, which was minor. (Tr. at 420-21.)

Dr. Branson assessed fibromyalgia, diffuse joint pain, gelling phenomenon, and stiffness. (Tr. at 421.) He opined that Claimant did not require surgical intervention but recommended physical therapy to improve her function. (Id.) He suggested that she return to a rheumatologist. (Id.)

Wassim Saikali, M.D.:

Claimant treated with Dr. Saikali from May 2006, through June 2008. (Tr. at 371-81.) On May 18, 2006, Claimant presented to Dr. Saikali for evaluation of joint pain. (Tr. at 381.) Dr. Saikali diagnosed Claimant with classic fibromyalgia, with no clinical evidence of rheumatoid arthritis or lupus. (Id.) He noted that Claimant was taking a lot of pain medication that was not helping and recommended that she increase her activities. (Id.) Dr. Saikali believed that Claimant also had chronic pain syndrome. (Id.) Dr. Saikali recommended aggressive treatment for depression and increased activities, and prescribed Lyrica, stopped the Tramadol, and decreased the Lortab she was taking. (Id.) On August 18, 2006, Claimant reported increased right knee pain and discomfort. (Tr. at 380.)

Claimant was doing water aerobics in her pool at home. (Id.) On exam, he observed no swelling in her MCPs or PIPs, but noted tenderness in the trapezia, nuchal area, with minimal right knee degenerative hypertophy. (Id.) He assessed osteoarthritis of the knees and possible mild internal derangement and fibromyalgia. (Id.) Claimant received injections of Synvisc to her right knee on September 14, 2006, September 21, 2006, and October 2, 2006. (Tr. at 377-79.)

Claimant reported to Dr. Saikali on November 3, 2006, as a walk-in, with complaints of right knee pain. (Tr. at 376.) She reported that the Synvisc made her pain worse and that she had severe pain and was limping when she walked. (Id.) On exam, Claimant was in tears and had tenderness over the right knee with mild ballottement. (Id.) Dr. Saikali administered a steroid shot and ordered an MRI of the right knee. (Id.) On January 3, 2007, Claimant reported multiple joint pain and discomfort but indicated that the right knee was better with the injection, though she had continued pain and discomfort, worse with prolonged standing. (Tr. at 375.) She reported muscle soreness in the neck, shoulders, and arms, but refused Celebrex. (Id.) On exam, Dr. Saikali noted minimal degenerative nodules in the small joints of the hands but no swelling; and mild right knee ballottement and tenderness. (Id.) He noted that the MRI showed chondromalacia and effusion, but no meniscal tear. He gave her a knee brace and instructed her to increase activities with stretching exercises. (Id.) On May 22, 2007, Claimant reported that the Synvisc helped her remarkably for the last five to six months. (Tr. at 374.) Dr. Saikali recommended weight loss and exercise. (Id.)

On October 8, 2007, Claimant reported that she wanted the Synvisc but that her insurance co-payment was high. (Tr. at 373.) She reported recurrent right knee pain. (Id.) Dr. Saikali recommended continued weight loss and quadriceps exercises. (Id.) On April 2, 2008, Claimant reported that she was doing well until she ran out of her Flexeril, which helped with muscle soreness. (Tr. at 372.) Dr. Saikali prescribed Flexeril and advised Claimant to increase activity, perform stretching exercises, and lose weight. (Id.) On June 10, 2008, Claimant reported that she was not doing well and had pain

8

and discomfort in multiple joints. (Tr. at 371.) She felt tired and fatigued, primarily, and slept only two to three hours daily. (Id.) Dr. Saikali prescribed Ambien, stopped the Topamax and Flexeril, and suggested that she see a psychiatrist. (Id.)

Carl Shelton, M.D. - Medical Rehabilitation Associates:

Claimant treated with Dr. Shelton from March 2009, through June 2010, for pain management. (Tr. at 309-18.) On March 10, 2009, Claimant complained of pain all over and indicated that she walked on the treadmill at home and performed physical therapy exercises. (Tr. at 316.) Physical exam revealed full range of extremity motion and sensation. (Id.) She had some tenderness in the spine. (Id.) Dr. Shelton recommended that Claimant start water aerobics or use a stairclimber or elliptical. (Id.)  On August 25, 2009, Claimant noted that she performed stretching exercises at home and Dr. Shelton noted on exam that her range of motion, strength, and sensation were within functional limits. (Tr. at 314.) Claimant noted that she continued to work at the daycare and was involved with her children's sports. (Id.) Physical exam findings remained essentially the same on November 24, 2009 (Tr. at 313), and on December 8, 2009, she had limited trunk range of motion with back tenderness. (Tr. at 312.) On June 7, 2010, Claimant reported that the daycare had been shut down, and she reported pain all over her body. (Tr. at 310.) She continued to perform her exercises at home and physical exam continued to demonstrate range of motion, strength, and sensation within normal functional limits. (Id.) She had full range of trunk motion. (Id.)

Pamela Faulkner, D.O. - Midtowne Family Practice, PLLC:

On January 8, 2009, Dr. Faulkner examined Claimant for complaints of elevated blood pressure for the past couple weeks. (Tr. at 301.) Dr. Shelton had prescribed Enalapril 10mg and the blood pressure remained elevated. (Id.) Dr. Faulkner therefore, increased it to 20mg. (Id.) On physical exam, she noted that Claimant's blood pressure was 130/88, and thus, not that high. (Id.) She assessed fibromyalgia and hypertension and advised Claimant to return for a follow-up in one month. (Id.)

Claimant returned on January 27, 2009, complaining of leg cramps from the Dyazide that she was on. (Id.) Dr. Faulkner checked her calcium and potassium levels, which were normal, so she switched her to a different blood pressure medication, Metoprolol 25mg. (Id.) Claimant returned to Dr. Faulkner on July 16, 2009, with complaints of epigastric pain for three days. (Tr. at 303.) Dr. Faulkner noted that Claimant had not been to her since January. (Id.) She also noted that Claimant had not been taking her blood pressure or cholesterol medication. (Id.) Claimant explained that she quit taking everything and did not like taking medications, except her pain pills and anxiety medicines. (Id.) Dr. Faulkner noted that her blood pressure was good, but she refilled her Enalapril 20mg and ordered blood work to check her cholesterol before restarting Lipitor. (Id.) Claimant missed a follow-up appointment on July 27, 2009, but was seen on July 31, 2009. (Tr. at 302-03.) Dr. Faulkner noted that Claimant's statements were inconsistent regarding her medications and whether her epigastric pain had improved and Dr. Faulkner noted that she herself was a bit confused with Claimant's statements. (Tr. at 302.)

On January 7, 2010, Claimant complained of headaches that began four days earlier. (Tr. at 302.) Dr. Faulkner noted that Claimant was not in any distress, laughed and talked, and moved her neck freely. (Tr. at 302, 305.) Dr. Faulkner noted that the headaches were not of any worrisome type and she suspected that stress was playing some role in it. (Tr. at 305.) She increased her Prozac to 40mg daily. (Id.) On February 1, 2010, Claimant presented for a follow-up and complained of headaches accompanied by a lot of stress and left arm pain. (Tr. at 305.) Claimant reported that she fell last fall and did not experience any pain until last month. (Tr at 304.) She indicated that it hurt to raise her shoulder and that the pain worsened when her nephew hit her shoulder the night before. (Id.) On examination, Dr. Faulkner noted that Claimant had very good strength in her shoulder against down resistance. (Id.) She ordered an x-ray of the shoulder. (Id.) Claimant cancelled follow-up appointments with Dr. Faulkner on March 1, 2010, March 12, 2010, and on May 17, 2010. (Tr.

at 304.)

O'Saile Orthopedics, Inc.:

On May 13, 2010, Steven B. O'Saile, D.O., examined Claimant for complaints of right knee and left shoulder pain. (Tr. at 298-99.) Claimant reported that steroid injections did not relieve the knee pain. (Id.) She reported generalized weakness, fatigue, night sweats, muscle weakness, depression, insomnia, chest pain, joint pain and stiffness, back and neck pain, disc problems, leg and left shoulder pain, and bilateral hip pain. (Tr. at 298.) Physical examination revealed that Claimant had tenderness over the right knee, with mild swelling and effusion, and a range of motion of 0 to 110 degrees. (Tr. at 299.) She also had tenderness of the left shoulder, but no swelling, and results of the SLAP test were negative, an impingement test were negative, and an apprehension test was negative. (Id.) Dr. O'Saile assessed left shoulder biceps tendonitis and right knee arthritis, and prescribed Synvisc and a Medrol dose pack for the shoulder, and advised Claimant to follow-up once she filled the Synvisc prescription. (Id.)

Georgianna Richards, M.D. - Raleigh Neurology:

Claimant first saw Dr. Richards on February 16, 2011, for complaints of fibromyalgia, depression, and insomnia. (Tr. at 361-64.) Claimant reported that she was diagnosed with fibromyalgia 17 years ago. (Tr. at 361.) The disease began with symptoms of pain in her back that later involved her hip, shoulders and chest. (Id.) She was told in May 2010, at the ER that the disease involved her chest wall. (Id.) She reported weakness in her arms and legs, difficulty going up and down steps, occasional spasms in her back but she denied leg cramps, she reported that the pain was worse after doing household chores, and she admitted to constant fatigue and sleep problems. (Id.) She reported hot flashes since the age of 35 and sleep apnea. (Id.)

Physical examination revealed diffuse tenderness over the trunk, especially up her back and extremities. (Tr. at 363.) Claimant had intact sensation, normal tone and strength, symmetrical

11

reflexes, intact finger to nose, and normal gait. (Id.) Dr. Richards assessed myofascial pain syndrome, cannot exclude radiculopathy, uncontrolled hypertension, anxiety disorder with panic attacks, depression, and arthritis. (Id.) She ordered an MRI of the cervical spine and lab work. (Id.)

The MRI of Claimant's cervical spine, dated February 26, 2011, revealed shallow disc protrusion at C6-C7 which resulted in mass effect on the left C7 nerve within the lateral recess. (Tr. at 359, 366.) Claimant returned for follow-up with Dr. Richards on March 15, 2011. (Tr. at 359-60.) Claimant reported severe cramps, mainly on the right side of her neck and indicated that she lost use of her right hand occasionally. (Tr. at 359.) She reported pain in her left shoulder that she described as an ache, and she reported that there were times when she dropped objects from her hands when they went to sleep. (Id.) Physical examination revealed normal extremity strength, no atrophy was noted, normal muscle tone, intact sensation, and tenderness to palpation of the cervical spine around the C7-8 levels. (Id.) Dr. Richards assessed chronic pain syndrome/myofascial pain syndrome, cervical radiculopathy, paresthesias, and depression/anxiety. (Tr. at 360.) She prescribed Soma 250mg, continued Lortab, referred Claimant to Dr. Thymius for injections and pain management consultation, and indicated that she would refer Claimant for surgery but Claimant reported that she refused any surgery. (Id.)

On April 13, 2011, Claimant reported increased tingling and numbness on the left side and difficulty moving her right arm. (Tr. at 435.) She reported that she was afraid to drive, but refused any surgical intervention and was not willing to do the interventional pain management because she was afraid of needles. (Id.) On examination, Dr. Richards noted tenderness to palpation of the upper back and neck muscles, pain on the lateral rotation of the head, and tenderness on palpation of the cervical spine, but noted no atrophy, normal muscle tone, and intact sensation. (Tr. at 435-36.) She recommended physical therapy, including aqua therapy, continued her medications, and advised Claimant to return for a follow-up appointment in two months. (Tr. at 436.)

12

On June 13, 2011, Claimant reported that she was exercising three times a week, that Zanaflex helped primarily with neck pain, and that she continued to have chest soreness primarily when she moved and laid on her side. (Tr. at 433.) On physical examination, Dr. Richards noted diffuse tenderness in the extremities and the trunk, but normal strength and muscle tone, no pronator drift, intact rapid alternating movements bilaterally, and no atrophy. (Tr. at 433-34.) On July 19, 2011, Claimant reported that she was in a lot of pain after falling the day before when fishing with her children. (Tr. at 430.) She fell flat on her back and had been experiencing a lot of arm, shoulder, and right knee pain. (Id.) Physical exam revealed tenderness of the right shoulder with decreased range of motion, tenderness of the right knee on palpation, normal strength and tone, and no atrophy. (Tr. at 430-31.) Claimant's ambulation was normal. (Tr. at 431.)

On October 5, 2011, Claimant reported that she was in a lot of pain and had been without her medication for one and a half months. (Tr. at 428.) On exam, Dr. Richards noted that Claimant was oriented in all spheres. (Id.) Motor strength exam was limited secondary to pain, sensation was intact, and gait was slow with slight stiffness. (Id.) She prescribed Cymbalta, Zanaflex and Lortab. (Tr. at 429.) On her two-month follow-up on December 5, 2011, Claimant reported pain in her neck, arms, and hips, which was worsened with cold weather. (Tr. at 426.) Motor strength exam revealed slight decreased power on the right side and a slight decrease in sensation to pain and temperature on the right. (Id.) Coordination was slightly decreased on the right and gait and station were normal. (Id.) Dr. Richards continued her medications. (Tr. at 426-27.)

On February 8, 2012, Dr. Richards noted limited range of motion of the extremities and that Claimant walked with the assistance of a cane. (Tr. at 424.) On April 16, 2012, Claimant reported a lot of pain in her hips and knees and requested a referral to a psychologist to help her deal with four recent deaths. (Tr. at 422.) She reported increased panic attacks and indicated that she had been under a lot of stress. (Id.) Physical exam was unremarkable. (Id.) Dr. Richards referred Claimant to a

13

psychiatrist and continued her medications. (Tr. at 423.)

<u>Todd A. Smith, D.O. - Blue Ridge Internal Medicine</u>:

On April 20, 2012, Dr. Smith examined Claimant for complaints of insomnia. (Tr. at 383-85.)
Dr. Smith noted that Claimant had normal activity with no change in appetite, had normal energy
level and no complaints of fatigue. (Tr. at 384.) He also noted no joint complaints, muscle
complaints, change in personality, mood swings, or unusual behavior. (<u>Id.</u>) He noted nothing
remarkable on physical exam. (Tr. at 384-85.) He assessed GERD and recommended dietary changes,
elevation of the head of the bed, lifestyle changes, medication avoidance, no lying down two to three
hours after meals, and stress reduction. (Tr. at 385.) He further recommended diet and restrictions,
an exercise regimen, and the importance of compliance in the treatment plan. (<u>Id.</u>)

<u>Dr. Jeffry Gee - Behavioral Health Pavilion</u>:

Claimant was examined by Dr. Gee on May 15, 2012, on the referral of Dr. Richards, for
evaluation of anxiety and worsening symptoms of depression related to four recent deaths in her
family in a two-month time period. (Tr. at 437-38.) Claimant reported tearfulness, sadness, anxiety,
low energy, feelings of helplessness and hopelessness, some passive suicidal ideation without intent
to harm herself, poor sleep, and fair appetite. (Tr. at 437.) On mental status exam, Dr. Gee observed
that Claimant was alert and oriented, pleasant and calm, maintained good eye contact, exhibited
normal rate and tone of speech, had good hygiene, had an "ok" mood and congruent affect, had some
tearfulness, denied suicidal or homicidal ideation, denied hallucinations or delusions, presented linear
and logical thoughts that were goal-directed, had good memory and concentration, had good insight
and judgment, and exhibited no abnormal movements. (Tr. at 438.) Dr. Gee diagnosed major
depressive disorder, recurrent type, without psychosis and assessed a GAF of 45/60. (<u>Id.</u>.) He
prescribed Wellbutrin and requested that Claimant return in three months for follow-up. (<u>Id.</u>)

Princeton Community Hospital:

On May 3, 2010, Claimant presented to the ER complaining of chest pain. (Tr. at 270, 415.) She reported that she was sitting in a classroom when she had an acute onset of sharp chest pain that radiated to her back, with left upper extremity numbness. (Id.) Claimant denied shortness of breath, muscle weakness or joint stiffness, numbness, tingling, or tremors, and anxiety or depression. (Tr. at 271, 416.) Physical exam revealed good muscle strength throughout and normal heart rate. (Id.) She was diagnosed with chest pain due to poorly controlled hypertension and was discharged the next day (Tr. at 271, 416, 293-94.)

On January 28, 2012, Claimant presented to the ER complaining of right hip pain, with a five to six day history. (Tr. at 402-04.) A CT scan of her lumbosacral spine showed bulging of the disc and some neural foraminal encroachment. (Tr. at 402.) Claimant reported that she was unable to walk secondary to the pain, though she had normal strength in the bilateral lower extremities. (Id.) Physical examination revealed tenderness on superficial palpation on the upper part of the right gluteal area from the middle to the lateral side. (Tr. at 403.) She was able to move her hip joint with pain. (Id.) A pelvic and right hip x-ray revealed normal articulation without any bony spur or joint space narrowing. (Id.) An MRI scan of the lumbar spine revealed mild intervertebral disc bulging at L4-L5 with mild encroachment upon the thecal sac at L3-L4. (Tr. at 408.) Claimant was treated for pain with Imitrex 25mg and reported that her pain almost was relieved fully. (Tr. at 411-12.) She was discharged home in stable condition. (Tr. at 412.)

Community Radiology:

An open air lumbar MRI on July 22, 2001, revealed no evidence of compromising lesions; mild dehydration at L4-5 and L5-S1 discs with minimal disc protrusion at L4-5. (Tr. at 369.)

Tammie L. Smith, M.A. - Consultative Psychological Examination:

On October 19, 2010, Ms. Smith conducted a consultative psychological examination at the

request of the state agency. (Tr. at 322-27.) Ms. Smith observed that Claimant drove herself to the examination and arrived five minutes early. (Tr. at 322.) Claimant was casually and appropriately dressed, had good hygiene, was polite and friendly, and was cooperative throughout the interview. (Id.) Claimant was not using any assistive devices but noted that she occasionally used a knee brace and cane to assist with ambulation. (Tr. at 322-23.) Claimant reported her chief complaints as chronic fatigue syndrome, fibromyalgia, severe pain, arthritis in her right knee, hypertension, hyperlipidemia, and depression. (Tr. at 323.) She reported that she stayed tired all the time, was easily agitated, felt irritated at times, was sad for no reason, had decreased sleep and an increased appetite, had a history of intermittent suicidal ideation, had decreased memory and concentration, and anxiety. (Tr. at 323-24.) She indicated that she had a claustrophobic feeling and that sometimes she lost her breath, her heart pounded, and she felt trapped and panicked. (Tr. at 324.) Claimant reported that she was seeing John Terry, a licensed psychologist at Medical Rehabilitation Services, and that she also went there for pain management and saw Dr. Carl Shelton. (Id.)

On mental status examination, Ms. Smith noted that Claimant was cooperative and polite, exhibited relevant and coherent speech, was oriented, presented with a dysphoric mood and normal affect, had normal thought processes, denied delusions or hallucinations, had good insight and average judgment, had normal psychomotor behavior, and had normal concentration, persistence, and pace. (Tr at 326.) Claimant had a history of intermittent suicidal ideation without any present ideation or intent; and she had normal immediate memory, but moderate deficient recent memory, and mildly deficient remote memory. (Id.) Ms. Smith noted that Claimant attended church twice a month but denied any involvement with community activities. (Id.) She reported her daily activities to have included napping a lot during the day, eating out a lot, and fixing sandwiches at home. (Id.) Ms. Smith diagnosed major depressive disorder, recurrent, moderate; and anxiety disorder NOS. (Id.) She opined that Claimant's prognosis was good with psychiatric follow-up and opined that Claimant was

16

capable of managing her benefits. (Tr. at 327.)

Kip Beard, M.D. - Consultative Examination:

On November 17, 2010, Dr. Beard conducted a consultative examination at the request of the state agency, for complaints of arthritis, chronic fatigue, and fibromyalgia. (Tr. at 330-34.) Regarding her arthritis, Dr. Beard noted Claimant's reports of increased pain since her 30s, with increased pain in her neck and mid and lower back. (Tr. at 330.) Regarding her fibromyalgia, Claimant reported that she was diagnosed with chronic fatigue syndrome and complained of extreme tiredness all the time with the need to rest frequently throughout the day. (Id.) Her fibromyalgia caused neck, mid and low back pain with radiation to the shoulders and hips and intervening muscles in the arms and legs between the joints. (Id.) She reported muscle soreness, tenderness, fatigue, and chronic generalized fatigue. (Id.) She reported joint pains primarily involving her right knee, but also her hips, shoulders, and her right wrist. (Tr. at 330-31.) Dr. Branson told her a couple years ago that she qualified for a total knee arthroplasty, but she was too young to undergo the procedure. (Tr. at 331.) She had treated with aquatic therapy for her neck and back, but utilized no pain clinic treatment. (Id.) Claimant described her pain as constant, which was worse on cold and rainy days and rated her pain at a level 10 out of 10. (Id.) Her pain ranged from a throbbing, aching, stabbing, and pinching type pain with a lot of crunching and popping sounds of the right knee. (Id.) Claimant indicated problems pulling clothes out of a drier, mopping, vacuuming, being on her feet, she was unable to squat, she had trouble walking on hills and steps, and could not crawl. (Id.) Her pain was helped a little bit with resting, lying down, and taking medications. (Id.)

On physical examination, Dr. Beard noted that Claimant presented with a knee brace carried, but not worn. (Tr. at 332.) She did not use any ambulatory aides or assistive devices, and Dr. Beard noted that her gait was moderately limping on the right with knee pain. (Id.) He did not see the need for a cane. (Id.) Claimant had difficulty arising both from a seat and stepping up and down from the

17

exam table, though she appeared comfortable while seated and uncomfortable supine with back discomfort. (Id.) Exam of the cervical spine revealed mild pain on motion testing with tenderness without spasm and normal range of motion. (Tr. at 333.) Extension was 50 degrees. (Id.) Shoulder exam revealed some intermittent AC crepitus and pain on motion testing with tenderness with abduction of both at 130 degrees, and forward flexion of both to 150 degrees. (Id.) She had some trigger point tenderness around the neck and arms, consistent with fibromyalgia. (Id.) Examination of the hands, ankles, and feet was unremarkable. (Id.) Exam of the right knee revealed a palpable effusion with swelling, rather moderately severe crepitus at the knee with moderate pain with tenderness. (Id.) Flexion was 95 degree and extension was 15 degrees. (Id.) The left knee revealed some crepitus with some mild pain with tenderness with flexion to 120 degrees and normal extension. (Id.) Claimant had moderate pain on forward bending with paravertebral tenderness without spasm of the lumbosacral spine, with flexion to 75 degrees. (Id.) She was able to stand on one leg at a time without difficulty, seated straight leg raising test was to 90 degrees with back pain and supine was to 75 degrees with back pain. (Id.) Hips revealed back and hip pain with flexion of both hips to 90 degrees. (Id.) Claimant had weakness of the right knee at 4/5, but intact sensation. (Tr. at 334.) She was able to heel-walk, toe-walk, and tandem walk with moderate knee pain, but could not squat. (Id.) Dr. Beard assessed severe right knee osteoarthritis, generalized osteoarthrosis, fibromyalgia, chronic fatigue syndrome, and lumbar degenerative disc disease. (Tr. at 334.)

Jeff Boggess, Ph.D. - Psychiatric Review Technique:

Dr. Boggess, a state agency mental health consultant, completed a form Psychiatric Review Technique, on which he opined that Claimant's major depressive disorder and anxiety disorder NOS were non-severe impairments, that resulted in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 335-48.) In reaching his

opinion, Dr. Boggess reviewed Ms. Smith's consultative evaluation report and noted that there was no psychological treatment of record other than medications from her primary care physician. (Tr. at 347.) G. David Allen, Ph.D., affirmed Dr. Boggess's opinion, as written, on February 16, 2011. (Tr. at 358.)

Rogelio Lim, M.D. - Physical RFC Assessment:

On December 14, 2010, Dr. Lim, a state agency medical consultant, completed a form RFC Assessment, on which he opined that Claimant's chronic fatigue syndrome, fibromyalgia, chronic pain syndrome, and right knee arthritis, resulted in her ability to perform light exertional level work with occasional postural limitations, except that she can never climb ladders, ropes, or scaffolds; and environmental limitations, including an avoidance of concentrated exposure to temperature extremes, vibration, and hazards. (Tr. at 349-56.) In reaching this opinion, Dr. Lim considered Dr. Beard's consultative examination report and medical notes from Princeton Community Hospital in May, 2010. (Tr. at 356.) Caroline Williams, M.D., affirmed Dr. Lim's opinion, as written, on February 15, 2011. (Tr. at 357.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in finding that Claimant had the RFC to perform light work. (Document No. 11 at 12-14.) Claimant relies upon Dr. Beard's consultative evaluation and his reported areas of decreased range of motion, reports of weakness, right knee weakness and crepitus, and inability to squat as evidence of her inability to perform light exertional level work. (Id. at 12-14.) She asserts that Dr. Lim failed to include many of Dr. Beard's physical findings, and therefore, his assessment is inconsistent with the substantial evidence of record. (Id.)

In response, the Commissioner asserts that the ALJ discussed the entirety of the medical evidence of record and noted that although Claimant received treatment for her impairments, it was

routine or conservative in nature. (Document No. 14 at 22.) She noted that Claimant's physicians prescribed medications to treat her symptoms and ease her pain and that Claimant continued to exercise throughout the relevant period. (Id.) Physical exams showed that Claimant only occasionally walked with a cane without distress, had full range of motion, strength, tone, and sensation of her extremities. (Id.. at 22-23.) The Commissioner noted that Claimant missed follow-up appointments with her physicians and stopped taking medications on her own accord. (Id. at 23-24.) She continued to work at a daycare and administrative assistant job after filing for benefits, which required her to perform light exertional work. (Id. at 24.) Accordingly, the Commissioner asserts that the ALJ's RFC assessment is supported by substantial evidence.

In Reply, Claimant asserts that the Commissioner provided *post hoc* rationale in support of the ALJ's RFC determination, which is unacceptable. (Document No. 15 at 1.)

Claimant also alleges that the ALJ erred in finding that Claimant's psychological impairments were non-severe. (Document No. 11 at 14-17.) Claimant asserts that she had sought treatment for her depression and anxiety from her primary physician and from psychologists as early as 2011, and therefore, the ALJ erred in finding that these mental impairments were non-severe. (Id. at 16.) She further asserts that the ALJ erred in not considering Claimant's chronic fatigue syndrome, depression, or anxiety, in her RFC assessment, whether severe or not. (Id.) She notes that her allegations of chronic fatigue syndrome were consistent throughout the record and in her testimony. (Id.) She not only experienced fatigue, but insomnia, which would affect any job performance. (Id.) Also, her depression and panic attacks would affect job performance and likely cause her to decompensate in stressful environments. (Id. at 16-17.)

In response, the Commissioner asserts that substantial evidence supports the ALJ's determination that Claimant's depression and anxiety were not severe impairments. (Document No. 14 at 19.) The Commissioner asserts that Claimant points to nothing in the record to support or

establish that her mental impairments resulted in any functional limitations. (Id.) The Commissioner notes that Claimant did not receive ongoing or consistent counseling or therapy for her mental impairments, and at best, saw Dr. Gee only weeks prior to the ALJ hearing, for depression and anxiety. (Id. at 19-20.) His assessment was consistent with Ms. Smith's and those of the state agency consultants. (Id. at 20.) The Commissioner asserts that even if the Court finds that Claimant's mental impairments were severe, the ALJ's error is not reversible, because the ALJ considered the combined effect of all the impairments throughout the remaining steps of the sequential analysis. (Id. at 20-21.) Regarding the ALJ's RFC assessment, the Commissioner asserts that Claimant's mental impairments resulted in minimal, if any, functional limitations. (Document No. 14 at 25-26.) The Commissioner notes that Claimant did not receive ongoing treatment for mental impairments and was never hospitalized because of them. (Id. at 25.) She notes that Ms. Smith found normal concentration, persistence, and pace and that Drs. Boggess and Allen indicated no limitations in those areas and only mild limitations in activities of daily living and social functioning. (Id. at 26.) Furthermore, the Commissioner notes that none of Claimant's treating physicians indicated that Claimant's mental impairments would have impacted on her ability to work. (Id.) Although Claimant alleges that the ALJ failed to account for limitations arising from her chronic fatigue syndrome, she failed to point to any evidence demonstrating any such limitations. (Id.)

In Reply, Claimant asserts that the ALJ failed to consider the impact of Claimant's mental impairments, such as a diminished capacity to concentrate and maintain a pace in assessing Claimant's RFC. (Document No. 15 at 2.)

Analysis.

1. Physical RFC.

Claimant first alleges that the ALJ erred in finding that Claimant had the RFC to perform light work. (Document No. 11 at 12-14.) "RFC represents the most that an individual can do despite his

or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2012). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." <u>Id.</u> "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996).

In her decision, the ALJ found that Claimant had the RFC to perform light exertional level work. (Tr. at 58.) In reaching this conclusion, the ALJ summarized the evidence of record, including Claimant's testimony, the medical evidence, and the opinion evidence. (Tr. at 59-61.) The ALJ noted that Claimant had sought treatment for her severe impairments prior to her alleged onset date and that treatment included strengthening exercises, recommendations to increase activity, a knee brace, injections, and a medical regimen of Topamax, Flexeril, and Lortab. (Tr. at 59.) She specifically noted that follow-up treatment notes indicated remarkable improvement. (<u>Id.</u>) She also noted, as the Commissioner points out, that Claimant's treatment was sporadic and that she cancelled follow-up appointments and failed to attend scheduled appointments. (<u>Id.</u>) The ALJ specifically noted Dr. Beard's findings of crepitus and decreased range of motion findings. (Tr. at 59-60.) She continued to summarize the evidence and concluded that Claimant's treatment was conservative and routine and generally was successful in controlling her symptoms. (Tr. at 61.) The ALJ construed the gaps in

treatment and failure to attend follow-up appointments and recommendation as suggesting that Claimant's symptoms were not as serious as alleged. (Id.)

The ALJ noted that Claimant had continued to work and only stopped when the daycare center closed, which raised a question whether her continuing employment actually was due to medical impairments. (Tr. at 61.) The ALJ noted that Claimant's alleged disabling impairments were present at the same level of severity prior to onset. (Id.) Because the impairments did not prevent her from working then suggested to the ALJ that the impairments would currently not prevent her from working. (Id.) The ALJ also noted that Claimant's treating physicians failed to place any limitations on her and finally, the ALJ found that her assessed RFC was consistent with Claimant's subjective allegations. (Id.) The ALJ's statements are consistent with the Commissioner's statements set forth in her brief, which is not a post hoc rationale in support of the ALJ's decision as alleged by Claimant.

The evidence of record supports the ALJ's RFC analysis. Claimant takes issue with Dr. Lim's assessment, but he clearly states that he considered Dr. Beard's evaluation. Dr. Beard noted decreased range of motion values and some crepitus, which were considered by Dr. Lim. Dr. Beard did not make any specific limitation findings himself. Accordingly, in view of the foregoing, the undersigned finds that the ALJ's RFC assessment is very thorough and detailed, considers all the evidence of record, and is supported by substantial evidence.

2. Severe Mental Impairments & Mental RFC.

Claimant also alleges that the ALJ erred in failing to find that her mental impairments were severe and in assessing her mental RFC. (Document No. 11 at 14-17.) To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2012). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing

and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original); see also SSR 85-28 (An impairment is considered not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered."); SSR 96-3p (An impairment "is considered 'not severe' if it is a slight abnormality(ies) that causes no more than minimal limitation in the individual's ability to function independently, appropriately, and effectively in an age-appropriate manner."). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

In her decision, the ALJ concluded that Claimant's mental impairments were non-severe as they had been responsive to treatment and caused no more than minimal vocationally relevant limitations. (Tr. at 57.) Regarding her depression, the ALJ found that although she had a recent escalation in May 2012, due to the recent deaths of four family members, the evidence demonstrated prior to that time that she had only mild limits in activities of daily living and social functioning; and no difficulties in maintaining concentration, persistence, or pace or episodes of decompensation. (Id.) The same is true for her anxiety and panic attacks. Claimant did not seek any mental health treatment until May 2012, and although Dr. Gee prescribed Prozac, he assessed no mental limitations and the

record supports none. Ms. Smith found that Claimant's insight was good and that her concentration, persistence, and pace were normal. Likewise, Drs. Boggess and Allen found that Claimant's mental impairments were non-severe. Accordingly, based upon the foregoing, the undersigned finds that the ALJ's step two and RFC findings are supported by the substantial evidence of record. There is no evidence of any significant functional limitations resulting from her mental impairments, and therefore, the ALJ's mental RFC finding is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 14.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986);

Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th

Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections

shall be served on opposing parties, Senior Judge Faber, and this Magistrate Judge.

 The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy

of the same to counsel of record.

 Date: February 27, 2015.

R. Clarke VanDervort
United States Magistrate Judge